COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-00031-CV

IN THE INTEREST OF 

E.A.W.S., A CHILD 

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

This is an appeal from the termination of parental rights to E.A.W.S.,
(footnote: 2) a child.  Appellant Robin, the mother, complains in nine points that the trial court abused its discretion in denying her motion for continuance and that the evidence is legally and factually insufficient to support the termination of her parental rights.

Appellant David, the father, asserts in three points that there was insufficient evidence to support the trial court’s finding that the Texas Department of Family and Protective Services (“State”) made reasonable efforts to return E.A.W.S. to him, or that he failed to respond by filing an admission of paternity.  He also complains that to the extent his appeal is unduly restricted, section 263.405(i) of the Texas Family Code violates his due process rights under the United States and Texas Constitutions.

We affirm as to Robin.  We reverse the trial court’s judgment terminating David’s parental rights to E.A.W.S. and render judgment in his favor.

FACTUAL BACKGROUND

E.A.W.S. was born on January 17, 2005.  Robin took an overdose of Ambien, a hypnotic amnesiac that can cause memory loss,
(footnote: 3) three days before she was due to deliver E.A.W.S.  The actual number of Ambien pills that Robin took is disputed, ranging from four to ten.  Robin testified that she did not recall how many she had taken.  Victoria, E.A.W.S.’s paternal aunt, who seeks to adopt the child,
(footnote: 4) did not know exactly how many pills Robin took, but she asked Robin’s family to take Robin to the hospital to induce vomiting.  It is disputed whether Robin was only supposed to take one pill every twenty-four hours, or two, but she failed to follow either of these instructions.  Her grandmother testified that Robin took two Ambien after filling the prescription and two more later the same day.  She testified that the next day, Robin took two more in the morning before taking an overdose that afternoon.  The CPS caseworker, Christy Stewart, testified that Robin said she took ten Ambien pills. After a charcoal lavage was administered to Robin to induce vomiting and her obstetrician was called, labor was induced.  It does not appear that the Ambien overdose harmed E.A.W.S.

When informed that E.A.W.S. would be removed from her, Robin told  Stewart that she had tried to kill herself, but not the baby, with the Ambien, and that her plan had been for her family to get her to the hospital in time to save the baby but not herself.  This was not Robin’s first mention of suicide.  She testified, “I was put in a place for two weeks when I was fifteen years old for trying to kill myself.”  Robin told Brenda Brooks, the CPS supervisor who investigated Robin in 1999, that she had tried to commit suicide once when she was fourteen or fifteen by taking a bottle of sleeping pills.

After E.A.W.S.’s birth, Victoria and Roy tried to help Robin find a job and a place to live.  This was a challenge because of Robin’s prior felony conviction for injury to a child.  When Robin did work, she neglected her medications. Victoria testified that when Robin neglects her medications, she becomes aggressive, extremely agitated, and has problems concentrating and remembering things.  Robin started keeping odd hours and bad company,
(footnote: 5) which worried Victoria.  Then Robin quit her job because of some conflicts with scheduling and with a coworker, and remained out of work for another six to eight weeks.  Victoria testified that while Robin lived with her, Robin made comments to her about some of the CPS workers,
(footnote: 6) that she would “like to kill them, put a bullet through their brain.”

Robin moved out of Victoria’s house so that E.A.W.S. could live there.
(footnote: 7) After moving into an apartment subsidized by her church, Robin continued to suffer from depression and suicidal ideation.  She received prescriptions to treat depression first through Tarrant County MHMR and later through Ellis County’s mental health service, ADAPT.  Victoria testified that acquiring E.A.W.S. had become an obsession to Robin developing from the fact “[t]hat E.A.W.S. was taken away from her and that she’s been told that she can’t have her back.” The removal of E.A.W.S. at the hospital was not Robin’s first encounter with the State.  She has three other children:  B.A.S., the oldest child, born on December 22, 1994, lives with Robin’s grandmother, who is his primary caregiver.
(footnote: 8)  Robin’s other two children are N.C.D., born June 5, 1997, and T.A.D., born December 5, 1998; they live with their father.

In February 2001, Robin was sentenced to three years’ confinement after pleading nolo contendere to injury to a child, a felony.
(footnote: 9)  She was charged with that offense because of injuries suffered by T.A.D., who was discovered to have twelve fractures in various stages of healing at around six weeks old.
(footnote: 10)  At the hospital, when the CPS caseworker told Robin about the fractures, Robin cursed and screamed until she was allowed to speak to the doctor.  This volatile behavior was not unusual for Robin, who has suffered from extreme mood swings and has been diagnosed bipolar, with severe depression.  There was contradictory testimony at the termination trial regarding abuse Robin herself may have suffered as a child.
(footnote: 11)  Before the Ambien overdose, on the same day, an argument with her grandmother escalated to the point that Robin called the police.
(footnote: 12)
 While on parole, Robin met David at an Alcoholics Anonymous/Narcotics Anonymous meeting.  David had recently been released from prison and was also on parole.  During her parole, Robin was sent back to prison, once for removing her electronic monitor and once for violating her parole conditions.
(footnote: 13)  While Robin completed her prison term, David transferred to Missouri.  Upon her release, she followed him there.  Robin testified that their relationship was mostly good, except for one incident of domestic violence, when he called her “every name in the book,” she slapped him, and he “threw [her] up against the wall, and threatened to crush [her] skull.”  Robin returned to Texas pregnant with E.A.W.S.  David did not return to Texas and was not around Robin or E.A.W.S. after E.A.W.S.’s birth.

CPS worker Stewart testified that she gathered information on how to contact David after E.A.W.S. was born.  She made contact with him by telephone on January 21, 2005 to discuss E.A.W.S.’s removal from Robin.  She testified that at that time, he indicated to her that he was going to speak with his parole officer and see if he could come to the hearing to ask the judge to release the baby to him.
(footnote: 14)  David asked that E.A.W.S. be placed with him because he did not believe that E.A.W.S. was safe with Robin and he did not want E.A.W.S. in foster care.  Stewart testified that CPS did not do a home study on him, but did gather information to start one.  A certificate of paternity registry search conducted on November 1, 2005, shows that David had not filed a notice of intent to claim paternity for E.A.W.S.
(footnote: 15)
 Victoria, David’s sister, testified that she had been in contact with David throughout the course of the case.
(footnote: 16)  She also stated that he was aware of and supported her plan to adopt E.A.W.S., that he was not at the point in his life where he could safely parent a child, and that the court should terminate his rights.
(footnote: 17)  Joyce Quam, the CASA worker on the case, testified that she had spoken with David by phone about the plan for termination of his parental rights.  She testified that he told her that he would like E.A.W.S. to be adopted by Victoria and her spouse.  Campbell, the CPS supervisor on the case, recommended termination of any rights David might have and testified that it was her understanding that David was in agreement with that plan.

The State filed its original petition on January 20, 2005.  Termination of both Robin’s and David’s parental rights was listed in the original pleadings. Trial was originally set for December 8, 2005, announced at the July 21, 2005 permanency hearing, at which time the State also announced that it would not be seeking termination of parental rights, but would instead seek to place managing conservatorship with a relative.

At the November 10, 2005 permanency hearing, the State announced that it would seek termination of parental rights at trial, rather than permanent placement with relatives.
(footnote: 18)  The termination trial date was rescheduled at the November hearing for March 14, 2006.  However, the date for dismissal of the suit, under section 263.306(11) of the Texas Family Code, was January 23, 2006.  On December 2, 2005, Robin’s attorney received an e-mail notification that the termination trial was rescheduled for December 15, 2005.

Robin filed a motion for continuance on December 8, 2005.  At the hearing on the motion for continuance, on December 12, 2005, Robin’s attorney acknowledged that he had received the requisite forty-five days’ notice of the first trial setting and that termination was listed in the pleadings but asserted that he had inadequate time to prepare for a termination trial and to conduct discovery on the termination issues.
(footnote: 19)  He claimed that he did not have reasonable notice given the State’s change in plan from permanent placement to termination.  Finding that it was in E.A.W.S.’s best interest to bring a final resolution to the case, the trial judge denied the motion.

At the time of the termination trial, E.A.W.S. was living with Victoria, who testified about her concerns with regard to Robin’s emotional stability and safety and financial ability to provide for E.A.W.S.
(footnote: 20)  Robin had refused to take some of her medication
(footnote: 21) and had failed to take the rest with regularity.  When not medicated, she became aggressive, had extreme mood swings, and was easily agitated.  She failed to attend the counseling set up by CPS and a CPS drug assessment.  At trial, several witnesses testified that Robin’s behavior had not improved despite classes, therapy, counseling, and medication.  Robin testified that she did pay for and take some parenting and stress management classes on her own; however, she admitted that she was still unable to take care of her children and that she had been so frustrated by E.A.W.S.’s removal from her that she had had memory problems, “to where I’ve had to stop on the side of the highway to remember how to get to visitation sometimes.”

At the time of trial, Robin had been interacting with her son B.A.S. at her grandmother’s house.
(footnote: 22)  N.C.D. and T.A.D.’s paternal grandmother testified that it was not Robin’s fault that Robin had not visited N.C.D. and T.A.D. in the last year or so since E.A.W.S. was born, because of N.C.D.’s mental problems, in the form of a reactive attachment disorder to his mother.
(footnote: 23)  Robin testified that she has learned from her mistakes and that she is proud of the person she is today.
(footnote: 24)
 Robin was the only person listed to receive services on CPS’s service plans of March 1, 2005
(footnote: 25) and July 19, 2005.
(footnote: 26)  David was given notice of each judicial review held in the case.  He testified during the hearing on his motion for new trial that he had received actual notice of the final hearing through his family and that he had seen a petition that concerned Robin, seeking to terminate her parental rights, but he also said that “every time that I’ve spoken with CPS and family members, this entire proceedings has been pertaining to Robin and not me.”  
The original and amended petitions each included a clause to terminate David’s parental rights.

On December 15, 2005, the date of the final hearing, a bench trial, the trial court noted that David had been served with a copy of the original petition.  Prior to the opening of testimony, the court filed a typewritten, signed, witnessed, and notarized affidavit from David.  The affidavit bore David’s name and address at the top, followed by the case style and cause number,
(footnote: 27) and stated at the beginning, “COMES NOW, David [L.W.], ‘hereinafter referred to as to me, my, or respondent father’, and submits this affidavit in the matter of parental rights in the above entitled and numbered cause.”

The envelope containing the affidavit was addressed to Victoria, and it had been handed to the assistant district attorney that morning.  The affidavit itself was directed to the “TARRANT COUNTY OFFICE OF THE CRIMINAL DISTRICT ATTORNEY,”
(footnote: 28) but addressed “this Honorable Court” in several sections.  The record reflects the confusion generated by the affidavit at the time.  The assistant district attorney presented it to the court, stating,

I’m not sure if I would call it an answer or a statement that he’s typed up and prepared, and I’ve showed it to the attorneys to let them know I’ve received this, signed by him and notarized with the cause number and everything.  I guess that’s his own statement to the Court. 

When asked by the court if she wanted to file it, she replied, “I’m not sure what else to do with it.”
(footnote: 29)  The court then remarked, “I guess if it has the cause number on the top, I assume he’s attempting to answer this cause,” and reflected that it was “somewhat unusual.”  No one objected to the affidavit being filed, so the trial judge did so, stating, “I’ll file it right now.  I can file it.  I’ll note the time it was filed.”
(footnote: 30)
 The affidavit indicated first that David, “Respondent Father in this cause,” was unable to attend the hearing in person because he was living in another state.  However, because he was “cognizant of the fact that he ha[d] legal rights at stake in this matter,” he sought appointment of legal counsel to protect his rights.
(footnote: 31)  In the second section, marked “II. PARENTAL RIGHTS,” the affidavit also indicated that David had spoken to E.A.W.S.’s child advocate concerning E.A.W.S.’s best interests, that he had been asked by the advocate to “willingly relinquish” his parental rights to E.A.W.S., and that he would transfer those rights only on the condition that his sister Victoria and her husband be named the adoptive parents.  Specifically, in the second paragraph of section II, he states: “BE IT KNOWN TO ALL PARTIES CONCERNED IN THE MATTER OF [E.A.W.S.], Cause No. 323-79632J-05, I, David [L.W.], Respondent Father, do, and will ‘TRANSFER’ my parental rights with the sole exception that the adoptive parents are named Roy and Victoria.”
(footnote: 32) 
 It concluded with the following statement:

In closing, I willingly “TRANSFER” my parental rights in this matter with the stipulation that ROY, AND VICTORIA BE GRANTED FULL AND PERMANENT CUSTODY OF [E.A.W.S.], IN THE EVENT ROY AND VICTORIA ARE NOT GRANTED CUSTODY, THEN I FULLY RESCIND, AND RENDER THIS DOCUMENT NULL AND VOID.

The trial ended January 3, 2006; the order terminating both Robin’s and David’s parental rights
(footnote: 33) was signed January 11, 2005.  The Department of Family and Protective Services was appointed E.A.W.S.’s permanent managing conservator, authorizing it to place her for adoption in a suitable home.  Roy and Victoria were appointed E.A.W.S.’s possessory conservators.

As to Robin, the trial court concluded that she met the involuntary termination requirements of section 161.001 of the Texas Family Code.  Specifically, the court based its decision upon sections 161.001(1)(D), knowingly placing or allowing the child to remain in conditions or surroundings which endanger the child’s physical or emotional well-being; 161.001(1)(E), engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangers the child’s physical or emotional well-being; and 161.001(1)(L), having been convicted or placed on community supervision for being criminally responsible for the death or serious injury of a child under Texas Penal Code section 22.04; and meeting the best interest of the child requirement under section 161.001(2).  
Tex. Fam. Code Ann 
§ 161.001(1)-(2) (Vernon Supp. 2006).

As to David, the court stated in its order that it had found by clear and convincing evidence that he did not respond by filing an admission of paternity or by filing a counterclaim for paternity or for voluntary paternity to be adjudicated under chapter 160 of the Texas Family Code before the final hearing in the suit.  
Id.
 § 161.002(b)(1) (Vernon 2002).  It also found by clear and convincing evidence that David had not registered with the paternity registry.  
Id
. § 161.002(b)(2)(A)-(B).  It made a specific finding in the order that due diligence had been exercised “in attempting to identify, locate, and serve the alleged father.”  
Id
. § 161.002(e).  It terminated David’s parental rights based upon these findings and upon section 161.001(1)(N), constructive abandonment.  
Id
. § 161.001(1)(N).

On February 6, 2006, a hearing was held on Robin’s and David’s separate motions for new trial.  Both were denied.  Although requested by each appellant, the trial court did not file findings of fact and conclusions of law.

DISCUSSION

A.  Robin’s Motion For Continuance

In point nine, Robin contends that the trial court abused its discretion in denying her motion for continuance, claiming that when the State changed its position on termination, she received only thirteen days’ notice of this first contested trial setting, an insufficient time to prepare for a termination case.

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable.  
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).  Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Id 
at 242.  Whether the trial court grants or denies a motion for continuance is within its sound discretion.  
See
 
BMC Software Belg., N.V. v. Marchand
, 83 S.W.3d 789, 800 (Tex. 2002).  Therefore, its ruling will not be reversed unless the record shows a clear abuse of discretion.  
Id
.

Under rule 245, reasonable notice of the first setting of a contested case for trial is “not less than forty-five days.” 
 Tex. R. Civ. P. 
245; 
see In re J.B.
, 93 S.W.3d 609, 614-15 (Tex. App.—Waco 2002, pet. denied) (holding thirty-two days’ notice of first setting for trial of contested case was insufficient).  When a contested case has been previously set for trial, the court may reset it to a later date on any reasonable notice to the parties. 
 
Tex. R. Civ. P. 
245.

At the July 21, 2005 permanency hearing, the State announced that it would not be seeking termination, and the court set what Robin asserts was an uncontested trial for December 8, 2005.
(footnote: 34)  Uncontested cases may be tried or disposed of at any time, whether set or not.  
Id
.  But when the State announced at the November 10, 2005 hearing that it would seek termination after all, Robin claims that the case became contested.
(footnote: 35)  We agree.  This now-contested trial was set for March 14, 2006, which would have provided Appellant with not less than forty-five days’ notice of the contested trial setting, in compliance with rule 245.  
Id
.

However, the court later rescheduled the termination trial for December 15, 2005, to meet the suit’s statutory dismissal date.
(footnote: 36)  
See
 
Tex. Fam. Code Ann. 
§ 263.306(11).  Robin’s attorney received notice of this rescheduling on December 2, 2005.  Nothing in rule 245 allows a court to reschedule a contested hearing for a notice period of less than forty-five days.  
Tex. R. Civ. P
. 245
.  Therefore, by disregarding rule 245
’
s reasonable notice requirement and overruling Robin’s motion for a continuance, the trial court abused its discretion.  
See Downer
, 701 S.W.2d at 241-42; 
J.B.
, 93 S.W.3d at 614-15.  Our analysis does not end here, however.

To obtain reversal of a judgment based upon an error in the trial court, the appellant must show that (1) the error occurred and (2) it probably caused rendition of an improper judgment, or probably prevented the appellant from properly presenting the case to this court.  
Tex. R. App. P. 
44.1(a); 
Romero v. KPH Consolidation, Inc.
, 166 S.W.3d 212, 220 (Tex. 2005); 
see also In re Baby Boy R
., 191 S.W.3d 916, 922-23 (Tex. App.—Dallas 2006, pet. denied) (holding that even if court abused its discretion by not granting continuance, father facing termination of parental rights failed to show how this probably caused the rendition of an improper judgment).  The fact that a party has received less than the forty-five days’ notice required by rule 245 does not, standing alone, constitute harm.
(footnote: 37)  
See J.B.
, 93 S.W.3d at 615.

In 
J.B.
, the mother’s parental rights were first improperly terminated as a default judgment and then when granted a new trial, she filed three consecutive motions for continuance and still did not receive her forty-five days’ notice under rule 245.  
Id
. at 612-13.  The basis for all three motions was that her attorney needed additional time to organize the “approximately 1,000 pages” of documents provided by CPS and to conduct other appropriate discovery.
(footnote: 38)  
Id
. at 612-13.  On appeal, the mother successfully argued that she had been harmed because she did not have a sufficient opportunity to conduct depositions she felt necessary to present her case.  
Id
. at 616-17.

Here, Robin’s attorney made a single motion for a continuance.  He did not specify in his affidavit or at the continuance hearing the reason why more time was needed, beyond referring generally to discovery, sufficient time to meet with his client, and additional preparation time for trial.
(footnote: 39)  Nothing was proffered in the affidavit, at the continuance hearing, or in Robin’s brief to demonstrate how denying her forty-five days’ notice of the contested trial resulted in harm, either through the rendition of an improper judgment or in properly presenting her case to this court.
(footnote: 40)  Therefore, we must conclude that although there was an abuse of discretion, there was no harm; we overrule Robin’s ninth point.  
See
 
Tex. R. App. P. 
44.1(a).

B.  Sufficiency Of The Evidence

A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
In re M.S.
, 115 S.W.3d 534, 547 (Tex. 2003).  “While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”  
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.  
Tex. Fam. Code Ann. 
§ 161.206(b); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick
, 685 S.W.2d at 20-21; 
In re E.S.S.
, 131 S.W.3d 632, 636 (Tex. App.—Fort Worth 2004, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Tex. Fam. Code Ann. 
§ 161.001; 
In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

In a trial to the court where no findings of fact or conclusions of law are filed, the trial court’s judgment implies all findings of fact necessary to support it.  
Pharo v. Chambers County
, 922 S.W.2d 945, 948 (Tex. 1996).  Where a reporter’s record is filed, however, these implied findings are not conclusive, and an appellant may challenge them by raising both legal and factual sufficiency of the evidence points.  Where such points are raised, the applicable standard of review is the same as that to be applied in the review of jury findings or a trial court’s findings of fact.  
Roberson v. Robinson
, 768 S.W.2d 280, 281 (Tex. 1989).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  
Tex. Fam. Code Ann
. §§ 161.001, 161.206(a); 
In re J.F.C.
, 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980); 
In re K.W.
, 138 S.W.3d 420, 425 (Tex. App.—Fort Worth 2004, pet. denied).  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”  
Tex. Fam. Code Ann
. § 101.007.

The higher burden of proof in termination cases elevates the appellate standard of legal sufficiency review.  
J.F.C.
, 96 S.W.3d at 265.  The traditional no-evidence standard does not adequately protect the parent’s constitutional interests.  
Id
.  In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven.  
Id
. at 265-66.  We must review all the evidence in the light most favorable to the finding and judgment.  
Id
. at 266.  This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so.  
Id
.  We must also disregard all evidence that a reasonable fact-finder could have disbelieved. 
 Id
.  We must consider, however, undisputed evidence even if it is contrary to the finding.  
Id
.  That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not.  
City of Keller v. Wilson
, 168 S.W.3d 802, 827 (Tex. 2005).

If we determine that no reasonable fact-finder could form a firm belief or conviction that the grounds for termination were proven, then the evidence is legally insufficient, and we must generally render judgment for the parent.  
J.F.C.
, 96 S.W.3d at 266; 
see
 
Tex. R. App. P
. 43.3.

This higher burden of proof also elevates the appellate standard of factual sufficiency review.  
C.H.
, 89 S.W.3d at 25.  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”  
Id.
  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven.  
Id
.  Our inquiry here is whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent’s parental rights would be in the best interest of the child.  
Id
. at 28.

The distinction between legal and factual sufficiency lies in how we review the evidence.  
J.F.C.
, 96 S.W.3d at 266.  In a factual sufficiency review, in determining whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that its finding was true, we must consider whether disputed evidence is such that a reasonable fact-finder could not have resolved it in favor of the finding.  
Id
.  If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  
Id
.  If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding.  
Id. 
at 266-67.

1.  Robin’s Sufficiency Claims

Robin’s first eight points address legal and factual sufficiency of the evidence to meet the statutory requirements for involuntary termination of parental rights in section 161.001(1) and (2) of the Texas Family Code.  In points five and six, she claims that the evidence was legally and factually insufficient to support the finding that she engaged in conduct which endangered E.A.W.S.’s physical or emotional well-being.
(footnote: 41)  
Tex. Fam. Code Ann
. § 161.001(1)(E).  The State asserts that the evidence was amply sufficient to prove that Robin’s conduct before, during, and after her pregnancy constituted an endangerment to E.A.W.S.

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child’s physical or emotional well-being was the direct result of the parent’s conduct, including acts, omissions, or failures to act
.  Id. 
§ 161.001(1)(E); 
In re J.T.G.
, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).
  Termination under section 161.001(1)(E) must be based on more than a single act or omission; it requires a voluntary, deliberate, and conscious course of conduct.  
J.T.G.
, 121 S.W.3d at 125.  However, it is not necessary that the parent’s conduct be directed at the child or that the child actually suffer injury.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125. 

To determine whether termination is necessary because of endangerment, courts may look to parental conduct both before and after the child’s birth
.  In re D.M.
, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.); 
see also In re U.P.
, 105 S.W.3d 222, 234 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (using illegal drugs while pregnant as evidence of endangerment)
. 
 The specific danger to the child’s well-being may be inferred from parental misconduct alone.  
Boyd
, 727 S.W.2d at 533; 
In re R.W.
, 129 S.W.3d 732, 738, 741 (Tex. App.—Fort Worth 2004, pet. denied) (abusing drugs and alcohol, which contributed to mental instability and suicidal ideation, were a consideration in endangerment finding).  Drug abuse during pregnancy constitutes conduct that endangers a child’s physical and emotional well-being. 
See In re W.A.B.
, 979 S.W.2d 804, 806 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (using illegal drugs during and after pregnancy); 
Dupree v. Tex. Dep’t Prot. & Regulatory Servs
., 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).

A parent’s mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the child’s physical or emotional well-being.  
In re J.I.T.P.
, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); 
In re C.D.
, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ).  This includes a parent’s attempts to commit suicide.  
See In re A.M.C.
, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.) (finding endangerment from mother’s suicidal thoughts, suicide attempts, and neglect).  Conduct that subjects a child to a life of uncertainty and instability also endangers the child’s physical and emotional well-being.  
See In re S.D.
, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (using illegal drugs and violating parole provided sufficient evidence of endangerment).

Acts done in the distant past, without a showing of a present or future danger to a child, cannot be sufficient to terminate a parent’s rights.  
See Wetzel v. Wetzel, 
715 S.W.2d 387, 391(Tex. App.—Dallas 1986, no writ) (finding no endangerment when parent was cured of mental problems related to the child abuse that occurred four years before).  But evidence of abuse of another child, coupled with a present or future danger to the child in question, is relevant to determine whether a parent has engaged in an endangering course of conduct, even if the abuse occurred prior to the birth of the subject child.  
See In re Cochran
, 151 S.W.3d 275, 280 (Tex. App.—Texarkana 2004, no pet.) (stating that in the absence of any “current” conditions or actions that would constitute a danger to the child’s health or safety, the trial court could not have reasonably based its findings on prior terminations alone);
 
In re K.M.M.
, 993 S.W.2d 225, 227-28 (Tex. App.—Eastland 1999, no pet.) (finding endangerment when parent was incarcerated prior to birth of child at issue for sexual assault of a fifteen month-old child three years prior).

 Neglect can be just as dangerous to a child’s emotional and physical health as intentional abuse.  
In re W.J.H.
, 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied)
.  If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.  
Id
. at 716; 
see also In re S.P.
, 168 S.W.3d 197, 202-04 (Tex. App.—Dallas 2005, no pet.) (taking child from hospital before mother could take child home did not preclude finding of endangerment); 
In re D.T.
, 34 S.W.3d 625, 636-37 (Tex. App.—Fort Worth 2000, pet. denied) (stating that evidence of conduct before child is born, as well as evidence as to how a parent has treated another child or spouse, is relevant regarding whether a course of conduct under section 161.001(1)(E) has been established).  Imprisonment is another factor to be considered by the trial court on the issue of endangerment.  
Boyd
, 727 S.W.2d at 533.  However, the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are also relevant in determining whether a parent’s conduct results in “endangerment” under section 161.001(1)(E), even when the parent is incarcerated.  
D.T.
, 34 S.W.3d at 640.

We look at Robin’s conduct before and after E.A.W.S.’s birth to determine whether termination is necessary because of endangerment.  
See D.M.
, 58 S.W.3d at 812.  The specific dangers to E.A.W.S.’s well-being may be inferred from Robin’s misconduct alone.  
See
 
Boyd
, 727 S.W.2d at 533.  
Robin took an overdose of Ambien while thirty-nine weeks’ pregnant.  Whether she did this intentionally, to commit suicide, or by accident, she endangered E.A.W.S.’s physical well-being before E.A.W.S. was born.
(footnote: 42)  
See J.T.G.
, 121 S.W.3d at 122-23, 126-27; 
W.A.B.
, 979 S.W.2d at 806-08.  On the same day as the Ambien overdose, an argument with her grandmother escalated to the point that Robin called the police.  There was disputed testimony about actual physical violence during the altercation between Robin and her grandmother, and abuse Robin herself may have suffered as a child, which tend to establish a pattern of family violence, even without considering Robin’s history with her own children.  
See J.T.G.
, 121 S.W.3d at 122-23, 127.  Before E.A.W.S.’s birth, 
Robin served two years of a three-year sentence after pleading nolo contendere to injury to a child, a felony, for the twelve fractures suffered by her child T.A.D. when T.A.D. was around six weeks old.  If Robin had not taken the overdose while pregnant with E.A.W.S., her prior acts of abuse in the distant past would not be sufficient alone to terminate her parental rights to E.A.W.S.  
See
 
K.M.M
., 993 S.W.2d at 227-28.  However, the attempted suicide comprised a present and future danger to E.A.W.S. from Robin, so it was relevant for the trial court to also consider other acts of endangering conduct by Robin. 
 Id
 at 228.  Robin said she did not know exactly how the injuries to T.A.D. were inflicted.  She did acknowledge feeling responsible that the injuries took place in her home, and admitted to being neglectful, but claimed she did nothing intentionally.  Robin’s grandmother testified that as to T.A.D.’s injuries, Robin was negligent.
(footnote: 43)  Neglect can be as endangering to a child’s health as intentional abuse. 
 W.J.H.
, 111 S.W.3d at 715.  Evidence of Robin’s conduct before E.A.W.S. was born, as well as evidence of how Robin treated T.A.D. and other family members is relevant to determining whether a course of conduct has been established.  
D.T.
, 34 S.W.3d at 636-37.

In addition to testifying about her fight with David, Robin also testified that when she lived with N.C.D. and T.A.D.’s father, he kicked her in the stomach when she was pregnant with T.A.D. and that there was “always conflict” between them.  She testified that she and her grandmother “clash.” David requested that E.A.W.S. be placed with him when CPS first contacted him about E.A.W.S.’s removal from Robin, because he did not believe that E.A.W.S. was safe with Robin.

In 
Wetzel
, the court reversed a termination decision because the mother was able to prove that she was cured of the mental problems that were directly related to her abuse of her children.  715 S.W.2d at 390-91.  After E.A.W.S.’s birth, Robin still showed instances of mental instability and agitation, including threatening behavior and suicidal ideation, and failed to regularly take her medication.  
See Dupree
, 907 S.W.2d at 84.  She failed to attend counseling set up by CPS and a CPS drug assessment, and several witnesses testified that Robin’s behavior had not improved despite classes, therapy, counseling, and medication.  Robin did testify that she paid for and took some parenting and stress management classes on her own; however, she admitted at the termination trial that she was still unable to take care of her children, even though she had a place to live and a job.

We have carefully reviewed the entire record.  The trial court could have reasonably resolved disputed facts, such as whether the overdose was intentional and suicidal or accidental and negligent, whether the incident between Robin and her grandmother immediately before E.A.W.S.’s birth involved actual violence, and whether Robin behaved intentionally or negligently with regard to the prior abuse suffered by T.A.D., in favor of its findings.  Legally sufficient evidence exists that Robin’s acts, omissions, and failures to act constituted a course of conduct that directly resulted in E.A.W.S.’s physical and emotional endangerment.  
See J.T.G
., 121 S.W.3d at 125.  The evidence at trial showed that Robin knowingly engaged in conduct that endangered E.A.W.S.’s physical or emotional well-being, based on her acts and choices before and after E.A.W.S.’s birth.  
See
 
Tex. Fam. Code Ann
. § 161.001(1)(E); 
D.M.
, 58 S.W.3d at 812.  Having reviewed all the evidence in the light most favorable to the finding and the judgment, we hold that the evidence here is legally sufficient such that the trial court could reasonably have formed a firm belief that the endangerment ground for termination was proven. 
 J.F.C
., 96 S.W.3d at 265-66.

Additionally, based on our review of the entire record, a fact-finder could reasonably form a firm belief or conviction that the endangerment ground for termination was proven, based upon Robin’s overdose while pregnant with E.A.W.S., failure to consistently take her medication, the history and pattern of abusive relationships between herself and others, and her severe depression and fragile mental state.
  See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(E); 
C.H.
, 89 S.W.3d at 25; 
J.F.C.
, 96 S.W.3d at 265-66; 
J.T.G.
, 121 S.W.3d at 124-25.  Accordingly, we also hold that the evidence is factually sufficient to support the trial court’s finding on endangerment.  We overrule Robin’s fifth and sixth points.

Robin argues in her first and second points that the evidence was legally and factually insufficient to find that termination of her parental rights was in the best interest of E.A.W.S.

The purpose of the State’s intervention in the parent-child relationship is to protect the best interest of the child, not to punish parents for their conduct.  
In re A.V.
, 113 S.W.3d 355, 361 (Tex. 2003).  Although the termination suit can result in a parent’s loss of his or her legal relationship with the child, the primary focus is protecting the child’s best interests.  
Id
.  Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future; 

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  These factors are not exhaustive.  Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H.
, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children.  
Id.
  On the other hand, the presence of scant evidence relevant to each Holley factor will not support such a finding.  
Id
.

Robin argues that the State asked the court to view the best interest factors “through 1999 glasses,” asserting that she has matured since the events that led to her incarceration for injury to her child T.A.D.  However, the State removed E.A.W.S. from Robin in 2005, two days after E.A.W.S.’s birth, due to the Ambien overdose.  It is disputed whether Robin actually intended to commit suicide by overdosing on Ambien.  However, vomiting had to be induced at the hospital because Robin could not recall how many pills she had taken.  Even without considering her prior conviction for injury to a child, the trial court could reasonably have found that overdosing, even unintentionally, while thirty-nine weeks’ pregnant would have a negative effect on E.A.W.S.’s emotional and physical needs, as well as create emotional and physical danger to E.A.W.S., now and in the future.  One of the caseworkers testified that Robin told her that she had tried to kill only herself, and not the baby, with the Ambien.  The trial judge could have also reasonably concluded that Robin was suicidal, from this testimony and Robin’s own admission that she suffers from severe depression and has attempted suicide before.

E.A.W.S. also appears to have some special needs, and was described as a “high-demand” child even at eleven months old.
(footnote: 44)  At the time of trial, the evidence showed that Robin continued to have trouble coping with her own emotional problems and controlling her aggressive tendencies.

The other individuals seeking custody of E.A.W.S., E.A.W.S.’s paternal aunt Victoria and her husband, have raised three children to adulthood.  Quam, the CASA worker appointed to E.A.W.S.’s case, testified that Victoria and her husband would best serve E.A.W.S.’s best interests because of their experience, maturity, and “ability to calmly figure out what is best.”
(footnote: 45)  Victoria and her husband plan to adopt E.A.W.S.

Based on the undisputed facts alone, we conclude that the trial judge could reasonably have developed a firm belief or conviction that termination of Robin’s parental rights would be in E.A.W.S.’s best interest.  Because the disputed evidence is also such that a reasonable fact-finder could have resolved it in favor of the best interest finding, we hold that the evidence in the record was both legally and factually sufficient to prove that termination of Robin’s parental rights was in E.A.W.S.’s best interest.  We overrule Robin’s first two points.  
See J.F.C
., 96 S.W.3d at 265-66
; C.H.
, 89 S.W.3d at 25
.

We do not reach Robin’s remaining points raised on legal and factual sufficiency of the trial court’s conduct findings because only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child’s best interest.  
A.V.
, 113 S.W.3d at 362.

2.  David’s Sufficiency Claims

In his first two points, David argues that there was insufficient evidence to support the trial judge’s finding that the State made reasonable efforts to return E.A.W.S. to him, under section 161.001(1)(N)(i) of the Texas Family Code, or to support the trial judge’s finding that he failed to respond by filing an admission of paternity.  
Tex. Fam. Code Ann
. §§ 161.001(1)(N), 161.002. The State counters that David willfully failed to answer or appear in the lawsuit, such that he admitted all the elements of the termination petition, and therefore default judgment was appropriate.

Under Texas Rule of Civil Procedure 239, a default judgment may be granted when citation with the officer’s return has been on file with the clerk for the length of time required by rule 107, that is
, ten days.  
Tex. R. Civ. P. 
239; 107.  But if an answer is filed after the answer date, but before the trial court renders the default judgment, it is error for the court to render a default judgment.  
Davis v. Jefferies
, 764 S.W.2d 559, 560 (Tex. 1989); 
Frank v. Corbett
, 682 S.W.2d 587, 588 (Tex. App.—Waco 1984, no writ) (reversing default judgment even though answer was neither signed by defendant nor filed by trial court clerk in the trial court file).  Unlike a no-answer default judgment, in which a defendant admits the petition’s allegations by his failure to answer, a post-answer default judgment constitutes neither an abandonment of a defendant’s answer nor an implied confession.  
Stoner v. Thompson
, 578 S.W.2d 679, 682 (Tex. 1979).  Therefore, judgment cannot be entered on the pleadings, and the petitioner in such a case must offer evidence and prove his case. 
 Id
.

A defendant who timely files a pro se answer by a signed letter that identifies the parties, the case, and the defendant’s current address has sufficiently appeared by answer. 
 Smith v. Lippmann
, 826 S.W.2d 137, 138 (Tex. 1992); 
see also Santex Roofing & Sheet Metal, Inc. v. Venture Steel, Inc
., 737 S.W.2d 55, 56-57 (Tex. App.—San Antonio 1987, no writ) (noting reluctance to enter default judgment when some response is found).
(footnote: 46)
 David’s signed, notarized, and witnessed affidavit, which he sent in response to the request by E.A.W.S.’s child advocate that he “willingly relinquish” his parental rights and which stated the condition under which he would be willing to do so, i.e., upon the court’s judgment granting full and permanent custody of E.A.W.S. to his sister and her spouse, 
stated the cause number and the names of the parties involved.  
See Custom-Crete
, 82 S.W.3d at 657-58.  It also contained his address at the top of the first page.  
See Home Sav. of Am. FSB
, 928 S.W.2d at 218.  Thus, we conclude, in spite of the court’s statement in the “appearances” section of the termination order that David “did not appear and wholly made default,” that David did file an answer before judgment was rendered, and therefore a no-answer default judgment was inappropriate.
(footnote: 47)
 Because this was a post-answer default judgment, the State had to prove each element in its claim. 
 Stoner
, 578 S.W.2d at 682.  However, so long as we find that at least one of the grounds for termination was supported by the evidence and that termination is in E.A.W.S.’s best interest, we may uphold the trial court’s judgment even if there was not sufficient evidence to support termination on the other grounds.  
In re A.R.R.
, 61 S.W.3d 691, 698 (Tex. App.—Fort Worth 2001, pet. denied)
, 
disapproved on other grounds by A.V.
, 113 S.W.3d at 360
.

a.  Sufficiency Of The Evidence Under Section 161.002(b)(1), (2)

Section 161.002 of the Texas Family Code addresses the termination of parental rights of an “alleged biological father.”  
Tex. Fam. Code Ann. 
§ 161.002.  The rights of an alleged father may be terminated if

(1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160; or 

(2) he has not registered with the paternity registry under Chapter 160, and after the exercise of due diligence by the petitioner:

(A) his identity and location are unknown; or

(B) his identity is known but he cannot be located.

Id.
 
§ 161.002(b)(1), (2)(A)-(B); 
Phillips v. Tex. Dep’t of Prot. & Regulatory Servs
., 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.) (stating that subsection 161.002(b)(1) allows the State to summarily terminate the rights of an alleged biological father who does not assert his paternity).  However, if the alleged father files an admission of paternity or otherwise claims paternity, then the alleged father is able to stave off summary termination of his rights, and the State must instead meet the higher burden of proof found in section 161.001. 
Tex. Fam. Code Ann
. § 161.002(a); 
Phillips
, 25 S.W.3d at 357.

This court has held that there are no formalities that must be observed for an admission of paternity to be effective; an admission of paternity in letters written to the trial court will suffice.  
K.W.
, 138 S.W.3d at 430; 
see also Estes v. Dallas County Child Welfare Unit of Tex. Dep’t of Human Servs
., 773 S.W.2d 800, 802 (Tex. App.—Dallas 1989, writ denied) (holding that appellant’s statement in pro se answer that he was an indigent parent was sufficient to constitute an admission of paternity under former version of section 161.002(b)).  In 
K.W.
, the father sent several letters in which he asserted he was the child’s biological father.
(footnote: 48)  138 S.W.3d at 429.  We concluded that the father’s letters to the Texas Department of Protective and Regulatory Services (“TDPRS”)
(footnote: 49) and to the court constituted admissions of paternity sufficient to put TDPRS and the trial court on notice that he admitted his paternity and wanted to oppose termination of any rights he might have with respect to the child at issue.  
Id
. at 430.

Here, David sent a signed, notarized, and witnessed typewritten affidavit to the court in which he stated his full name followed by “hereinafter referred to as me, my, or respondent father” and in which he agreed to relinquish his parental rights to E.A.W.S.  As we noted in 
K.W.
, the issue of whether the child’s parentage was established, as opposed to whether it was simply admitted by him, was not before the trial court, and therefore is not before us.  
See id. 
 Accordingly, we conclude that David admitted his paternity of E.A.W.S. for purposes of section 161.002(b)(1). 

To render an order terminating parental rights under 161.002(b)(2), the State must have filed a sworn affidavit describing its effort to identify and locate the alleged father, and the trial court must then find that the State exercised due diligence in attempting to identify and locate him.  
Tex. Fam. Code Ann
. § 161.002(e).  The trial court’s order must contain specific findings regarding due diligence of the petitioner.  
Id
.

Our record does not contain any such sworn affidavit filed by the State and reviewed by the trial court.  
See id.
  Although the certificate of paternity registry search conducted on November 1, 2005, shows that David had not filed a notice of intent to claim paternity for E.A.W.S., the record indicates that David’s identity was known to CPS and that CPS contacted him on January 21, 2005, after E.A.W.S.’s birth.  The record indicates that he was served with the original petition on March 25, 2005, at the same address listed on his affidavit submitted on the day of the termination trial.
(footnote: 50)  Therefore we conclude that section 161.002(b)(2) cannot apply to terminate David’s parental rights, because his identity was known, and he had been located.  
Tex. Fam. Code Ann. 
§ 161.002(b)(2); 
see K.W.
, 138 S.W.3d at 431.

b.  Sufficiency Of The Evidence Under Section 161.001(1)(N)

The court cited section 161.001(1)(N) as an additional ground for terminating David’s parental rights.  Section 161.001(1)(N) provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has

constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:

(i) the department or authorized agency has made reasonable efforts to return the child to the parent;

(ii) the parent has not regularly visited or maintained significant contact with the child; and

(iii) the parent has demonstrated an inability to provide the child with a safe environment.

Id
. 
§ 161.001(1)(N); 
In re B.S.T.
, 977 S.W.2d 481, 486 (Tex. App.—Houston [14th Dist.] 1998, no pet.), 
overruled in part on other grounds by C.H.
, 89 S.W.3d at 26.  David contests the implied finding that the State made reasonable efforts to return E.A.W.S. to him, but does not contest the other findings that support termination under this ground.

Returning a child to a parent, under section161.001(1)(N)(i), does not necessarily mean that the child has to be physically delivered to the individual.  
See In re D.S.A.
, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.).  “Reasonable efforts” to reunite parent and child can be satisfied through the preparation and administration of service plans.  
See
 
Id
. at 570-72; 
In re K.M.B.
, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.).

In 
D.S.A.
, within several days of the father’s release from prison, a CPS worker spoke with him about a plan of service and visitation and twice arranged meetings with him that he failed to attend.  113 S.W.3d at
 570.  He failed to attend any of the appointments and classes arranged for him in the service plan and did not exercise any visitation rights.  
Id
. at 570-71.  CPS’s activities were held sufficient to meet the requirement of reasonable efforts to return the child.
  Id
. at 572.

In 
K.M.B.
, the State demonstrated that it had prepared several service plans designed to facilitate returning the child to the parent, but that the parent never completed any of them; these were held reasonable efforts by the State.  91 S.W.3d at 25
.  In 
B.S.T.
, the court held the evidence sufficient to support termination under subsection (N)(i) when a caseworker testified that all reasonable efforts had been made to return the children to the parents.  977 S.W.2d at 486.  In that case, there was sufficient evidence that although the father
 was not provided a separate family service plan, the mother did not know his whereabouts at the time the children were taken into custody, and after he was located by CPS and advised about visitation, he made no effort beyond two visits to be involved with the children.  
Id
.  Caseworkers also advised him that he should sign an affidavit of paternity, but he never did so.  
Id
.

We have painstakingly combed the record for traces of any efforts on the part of the State to return E.A.W.S. to David.  Of the two volumes of trial testimony, David is rarely mentioned.
(footnote: 51)  Most of the testimony by CPS caseworkers and other witnesses pertains to Robin.

CPS worker Stewart testified that a few days after E.A.W.S. was born, she was able to obtain a phone number for David and contacted him at that number on January 21, 2005.  
Cf. B.S.T.
, 977 S.W.2d at 486.  At that time, David indicated to Stewart his interest in seeing if E.A.W.S. could be placed with him.  CPS never completed a home study on his home.
(footnote: 52)  There is no evidence in the record that CPS advised him about visitation.  
Cf.
 
D.S.A
., 113 S.W.3d at 570; 
B.S.T.
, 977 S.W.2d at 486.  Campbell, the CPS supervisor, testified that her recommendation was that it was in E.A.W.S.’s best interest that David’s rights be terminated, and to her understanding, David was in agreement with that.  Campbell was asked the following question during her testimony at the termination trial:

Q: And through the course of working this case, was it your position as the supervisor that the Department’s efforts in this case needed to be focused on relative placement rather than a family reunification plan?

A: Yes.

Prior to this question, the testimony related exclusively to Robin and her interaction with Victoria, Roy, and E.A.W.S.

After testifying about Robin, the ongoing CPS caseworker, Sweeney, who worked under Campbell, was asked,

Q: Do you also believe that it’s in this child’s best interest that if there are any parental rights in place between her and David [W.], that those parental rights should be terminated?

A: Yes.

When asked if it was her understanding that David was in agreement with that, she answered affirmatively.

Robin is the only parent listed on either of CPS’s service plans, even though CPS was able to make contact with David and he indicated his interest in E.A.W.S. upon that contact.  
Cf. D.S.A.
, 113 S.W.3d at 570;
 K.M.B.
, 91 S.W.3d at 25; 
B.S.T.
, 977 S.W.2d at 486.  While there is no evidence in the record that David made any attempts to visit E.A.W.S. or to arrange visitation, there is also no evidence that he failed to make any such attempts.  There is a complete lack of testimony in the record by any of the CPS caseworkers about any efforts, reasonable or otherwise, to return E.A.W.S. to David.

Without any evidence of an effort by CPS to return E.A.W.S. to David, no reasonable fact-finder could form a firm belief or conviction that this element in the constructive abandonment ground for termination was proven.  
See
 
J.F.C.
, 96 S.W.3d at 265-66.  Because we have held the evidence is legally insufficient to support any of the three grounds for termination alleged by the State against David, we must reverse and render judgment in his favor.
(footnote: 53)  
Id
. at 266.

C.  David’s Constitutional Challenge

David argues that section 263.405(i) of the Texas Family Code violated his due process rights under the United States and Texas Constitutions, by unduly restricting his appeal.
(footnote: 54)  Because he has not alleged any issue that he was precluded from raising on appeal as a result of section 263.405(i)’s application, and because we have determined that the termination of his parental rights must be reversed on other grounds, we will not address this constitutional challenge.  
See
 
Tex. R. App. P. 
47.1.

CONCLUSION

Having overruled Robin’s points, we affirm the termination of her parental rights to E.A.W.S.  We reverse the trial court’s judgment terminating David’s parental rights to E.A.W.S. and render judgment in his favor.  We affirm the remainder of the trial court’s judgment.
(footnote: 55) 

DIXON W. HOLMAN

JUSTICE

PANEL A:  LIVINGSTON, HOLMAN, and WALKER, JJ.

DELIVERED:  December 7, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P. 
47.4.

2:
To protect the privacy of the parties involved in this appeal, we identify the child by initials only and the Appellants by first name only.  
See
 
Tex. Fam. Code Ann. 
§ 109.002(d) (Vernon 2002).

3:
Robin’s doctor prescribed Ambien for her.

4:
Victoria saw Robin at least once a week while Robin was pregnant and took Robin to her doctors’ appointments.  Robin lived with Victoria and her husband, Roy, for around four months after E.A.W.S. was born.

5:
According to Victoria, the people with whom Robin began associating “all had CPS cases against them.”  Robin was going to bars with these people and drinking while on prescription medication.

6:
These caseworkers were Stewart, Daphne Campbell, and Julianne Sweeney.  All three testified at the termination trial.

7:
Victoria testified that when E.A.W.S. was placed in her home, Campbell, the ongoing caseworker’s supervisor, told her that she should distance her relationship with Robin.  According to Victoria, this was because of CPS’s concern that she otherwise “might have crossed the line and permitted the baby to be alone with Robin or allowed Robin to take the baby.”

8:
Robin was eighteen years old when she had B.A.S.

9:
It would appear from the record that she served two years, and then had one year of parole.  Her parole was revoked twice, after which she chose to return to prison to serve the remainder of her time.  She stated at the termination trial, “I told them I’d rather finish my time and get it over with and start my life.”

10:
These fractures included three skull fractures and fractures of both clavicles, three ribs, the right femur, and the right distal radius bone.  At eighteen months old, N.C.D. had a cigarette burn on the side of his mouth.

11:
Stewart testified that Robin told her that “she had suffered every type of abuse that you could think of.”  Victoria testified that Robin told her about abuse by Robin’s uncles, from age ten to sixteen.  She stated that Robin told her “that her uncles [were] particularly violent, that she’s been assaulted, that . . . she has a scar on her face where one of her uncles literally tore her lip.”

Robin’s aunt Linda testified that she was aware that Robin had been abused by her uncles.  In contrast, Beulah, Robin’s grandmother, testified that she was not aware that Robin had been abused by Beulah’s sons while she grew up in Beulah’s home.  Beulah stated, “She was never abused by my son,” and denied being aware of any CPS investigation of that abuse.

Brooks, the CPS caseworker from 1999, testified that she had checked the CAPS system to see if there was any CPS history that involved Robin as a child and that she had found one case from October 1992, a “reason-to-believe physical abuse” by her uncle.

12:
Whether actual physical violence occurred during the altercation between Robin and her grandmother is disputed.  Victoria testified that when Robin called her before going to the hospital, Robin told her that she and her grandmother had had a fight and that her grandmother had hit her and she had hit her grandmother.

13:
One of the conditions of Robin’s parole was to not associate with known felons.  At the time they met, David was also wearing an electronic monitor.  Robin testified that she did not know that meant she could not talk to him outside of the AA/NA meetings.

14:
There is nothing in the record to indicate that any such requests were made.

15:
The trial judge noted for the record before the termination hearing began that “on file with this court is the Certificate of Paternity Registry Search indicating that a diligent search of the Paternity Registry has been made and no Notice of Intent To Claim Paternity has been located concerning the child the subject of this suit.”  
See
 
Tex. Fam. Code Ann. 
§ 161.002(b) (2)(A)-(B) (Vernon 2002).

16:
Most of this testimony consisted of Victoria’s statements about David’s concerns about Robin and E.A.W.S.  There is no testimony about how frequently she was in contact with him.

17:
Victoria testified that David has spent time in prison, has attention deficit/hyperactivity disorder, and would not be able to properly parent E.A.W.S.  She testified that “[h]e’s 43 years old, and he’s never parented anything.”

18:
The State had also filed a motion for a finding of aggravated circumstances, under Texas Family Code section 262.2015(b)(6)(D), based on Robin’s 2001 conviction.  A hearing on that motion was set for November 8, 2005.  Section 262.2015(b)(6)(D) addresses the felony assault of the child or another child of the parent that resulted in serious bodily injury to the child or another child of the parent. 
 Tex. Fam. Code Ann. 
§ 262.2015(b)(6)(D) (Vernon Supp. 2006).

19:
Robin’s attorney stated that he effectively had a little over a month’s notice of the plan to seek termination, although he acknowledged at the hearing that “they [TDFPS] always put termination in their pleadings, and I guess that’s our official notice.”

20:
Victoria also testified about her concerns about Robin’s family, in that “Robin has a number of close family members, uncles, aunts, that drink to excess and have been known to exhibit violence when they do toward their own family members.”

21:
According to Victoria’s testimony, Robin has problems swallowing large pills and that was Robin’s explanation for not taking some of her medication. 

22:
Robin testified that she and B.A.S. went to Boy Scouts and to the dollar movies and that she visited him every week.

23:
N.C.D.’s paternal grandmother testified that N.C.D. was kicked out of school on his first day of first grade and that he had to switch schools.  Former CPS worker Misty Wall testified that at eighteen months old, N.C.D. was extremely aggressive, needed intense counseling, and that hospitalization and medication were considered for him.  While in foster care, he would scrape on his leg with a fork until it bled, bite his lips until he bled, and bang his head until he had cuts and bruises.  At one point, he stabbed the foster family’s cat and threw it in the pool.

24:
Robin said, “You can’t change the things you’ve been through, you know, and I wouldn’t change them for the simple fact that it wouldn’t make me the person I am today, and I’m very proud of the person I am today. I don’t care what anybody says.”

25:
The March 
service plan indicates that CPS was not able to locate David “before the PPT.”

26:
The July service plan indicates in its visitation summary that David “has not engaged in visits.”  It also indicates that David was in Missouri and that “CPS has not been able to locate him before the PPT.”

27:
“IN RE: [E.A.W.S.]. CAUSE NO. 323-79632J-05.”

28:
This is the official name of the office, which handles criminal and civil cases, including representing the State of Texas in proceedings brought to terminate parental rights.  
See
 Tarrant County District Attorney,  http://www.tarrantda.com 
(last visited Oct. 17, 2006).

29:
She added, “To me, what I would do if we had received it a month ago is we would file-mark it and give copies to everybody, so I guess that’s what I’ll do at this time.”

30:
At the top of the affidavit, the trial judge wrote “December 15, 2005, filed in court at 9:00 a.m.,” and initialed it.

31:
David made no mention of pauper status in the affidavit.  He did claim pauper status in a request for counsel filed for his appeal.

32:
In the affidavit, David further stated that “[w]ith the Court’s granting, and expediting this adoption, [E.A.W.S.] will be in a loving, secure household, surrounded by her sister, cousins, aunts, uncles, and grandparents, and further, with this adoption I too, can and will be the best that I can be part of her life!” After this statement, David added, “I pray this Honorable Court does not have the wrong impression of me, I wish this situation had never presented itself.” 

33:
Under “Appearances” in the order, the court stated that “Respondent Father, DAVID [W.], although duly and properly notified, did not appear and wholly made default.”

34:
Robin’s attorney asserted in his affidavit that the setting on December 8, 2005 was not a setting for a termination trial, but rather, that it was “essentially scheduled as an uncontested matter.”

35:
At the continuance hearing, Robin’s attorney stated that Robin did not want her rights terminated and that she wanted to be involved in her daughter’s life, even if that would be through limited visitation for the immediate future. 

36:
The suit’s dismissal date was January 23, 2006.

37:
This court has addressed abuse of discretion separately from the rule 44.1 harm analysis.  
See McMeekin v. McMeekin
, No. 02-05-00118-CV, 2006 WL 820399, at *4 (Tex. App.—Fort Worth March 30, 2006, no pet. h.) (mem. op.).

38:
In 
J.B.
, the mother’s counsel complained that the file provided by CPS, in addition to containing approximately 1,000 pages, was “completely out of order,” and needed to be organized, categorized, and reviewed before he would even be able to depose witnesses.  93 S.W.3d at 
616. 

39:
At the continuance hearing, the State’s attorney offered, “[W]e’ve pulled copies of this case material off of the system at CPS . . . and we’d be happy to give those to Mr. Gault [Robin’s attorney] without his need for a formal discovery if that helps at all.”

40:
Further, Robin’s attorney acknowledged at the continuance hearing that termination was listed in all of the pleadings.

41:
Under section 161.001(1)(E), the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence “that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child,” and that termination is in the best interest of the child under section 161.001(2).  
Tex. Fam. Code Ann. 
§ 161.001(1)(E), (2).

42:
Victoria, a pharmacist, testified that Ambien is “not a medication that you would dispense to a woman in the latter stages of pregnancy because of the excessive sleepiness it could cause the fetus.”  Drug abuse during pregnancy may constitute conduct that endangers a child’s physical and emotional well-being. 
 See U.P.
, 105 S.W.3d at 234.

43:
When questioned about whether she felt Robin bore some responsibility for what happened to T.A.D., Beulah responded, “On her part, I would say negligence.”

44:
Victoria testified that “anyone that is going to be taking care of [E.A.W.S.] had better become accustomed to three or four hours of sleep and fit-throwing and screaming.”  E.A.W.S. is also a biter and a slapper.  Victoria testified that E.A.W.S. shows anger by slapping and kicking and biting and that it happens daily.  “She has good days that she doesn’t do it quite so much, but you never know what’s going to provoke her to bite or to slap.”  With regard to the biting, “[s]ometimes she’s going to go ahead and bite the person she’s going after anyway, so even if you put her down, she’ll go back and bite them . . . she knows she wants to go back and do what she wants to do.”

45:
Quam added that Victoria and her husband “really love [E.A.W.S.], but they love Robin too.”  Robin lived with Victoria and her husband for several months after E.A.W.S. was born.

46:
Under rule 85, an “answer” to a cause of action may consist of 

motions to transfer venue, pleas to the jurisdiction, in abatement, or any other dilatory pleas; of special exceptions, of general denial, and any defense by way of avoidance or estoppel, and it may present a cross-action, which to that extent will place defendant in the attitude of a plaintiff.

Tex. R. Civ. P. 
85.  “Answers” sufficient to stave off default judgment having included a pauper’s affidavit, 
Hughes v. Habitat Apartments
, 860 S.W.2d 872, 873 (Tex. 1993); 
a letter from a defendant corporation’s vice president to the trial court clerk that includes the cause number and denies liability, 
Custom-Crete, Inc. v. K-Bar Servs., Inc.
, 82 S.W.3d 655, 657-58 (Tex. App.—San Antonio 2002, no pet.); and an unsigned letter filed by a corporation that contains the sender’s address, denies liability, and contains the trial court cause number, 
Home Sav. of Am. FSB v. Harris County Water Control & Improvement Dist. No. 70
, 928 S.W.2d 217, 218 (Tex. App.—Houston [14th Dist.] 1996, no writ).  
See also 
Julia F. Pendery, Shawn M. McCaskill & Hilaree A. Casada, 
Dealing with Default Judgments
, 35 
St. Mary’s L.J. 
1, 23-24 nn.90-100 (2003).

In 
Hock v. Salaices
, the court observed that

[t]raditionally, any sort of appearance will defeat a default.  Indeed, the courts have gone to great lengths to excuse defects in answers to prevent the entry of default judgments against parties who have made some attempt, albeit deficient, unconventional, or flat out forbidden under the Rules of Civil Procedure, to acknowledge that they have received notice of the lawsuit pending against them.

982 S.W.2d 591, 593 (Tex. App.—San Antonio 1998, no pet.) (distinguishing “answer” for default judgment purposes from “answer” for summary judgment purposes).

47:
The record does not include any requests by the State for a continuance  after David’s answer was filed.

48:
In 
K.W.
, in his first letter, to TDPRS, the father stated, “I Charles [W.] am the biological father of [K.W.].  I am writing you and the courts to inform you’s [sic] that I am not giving up my parental rights.”  138 S.W.3d at 429.  In his second letter, addressed to the court coordinator and filed by the trial court, he recited, “I Charles [W.] am the biological father of [K.W.] age 3 born 2-13-99,” and added that he wanted to inform all parties that he did not wish to abandon his parental rights. 
 Id
. 

49:
TDPRS is the former name of the Texas Department of Family and Protective Services.

50:
712 Sherman Avenue, Neosho, Missouri.

51:
Victoria testified that David is her brother, that she had contact with him during the course of the case, although she did not elaborate on how often or what kind, that he supported her plan to adopt E.A.W.S., and that his parental rights should be terminated.  Quam, the CASA worker, testified that she had spoken with David by phone, that it would be in E.A.W.S.’s best interests that his parental rights be terminated, and that he told her he would like to have E.A.W.S. adopted by his sister and her husband.  Neither Victoria or Quam testified about reunification between E.A.W.S. and David.

The remainder of testimony involving David, other than by the CPS workers Stewart, Campbell, and Sweeney, came from Robin, about how they met, how she followed him to Missouri, and a single incident of domestic violence between them before she returned to Texas.

52:
There is nothing in the record to indicate that David behaved uncooperatively with CPS.

53:
There was no finding by the trial court that David’s rights should be terminated based on construction of his answer as a voluntary relinquishment. 

54:
Section 263.405(i) provides:

The appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial.  For purposes of this subsection, a claim that a judicial decision is contrary to the evidence or that the evidence is factually or legally insufficient is not sufficiently specific to preserve an issue for appeal.

Tex. Fam. Code Ann
. § 263.405(I) (Vernon Supp. 2006).

55:
David does not challenge the portion of the trial court’s judgment appointing the State as permanent managing conservator of E.A.W.S., nor of the appointment of Victoria and her husband as possessory conservators of E.A.W.S.